**Billy THORNTON, Petitioner,**

v.

**BROWN & ROOT, INC., Highlands Insurance Company, and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents,**

**and**

**James H. BROUSSARD, Petitioner,**

v.

**WAUKESHA–PEARCE INDUSTRIES, INC., Highlands Insurance Company, and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.**

Nos. 80–2343, 81–4032.

United States Court of Appeals,
Fifth Circuit.

June 13, 1983.

---

Atreus M. Clay, Houston, Tex., for Thornton.

Bradley Jackson, Ben L. Reynolds, Houston, Tex., for Brown & Root, Inc. and Highlands Ins. Co.

Joshua T. Gillelan, II, Dept. of Labor, Washington, D.C., for U.S. Dept. of Labor.

William P. Rutledge, Lafayette, La., for Broussard.

Robert Mahony, Lafayette, La., for Waukesha, et al.

Before BROWN, GOLDBERG and POLITZ, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Petitioner Billy C. Thornton was employed on land by Brown & Root, Inc., constructing offshore stationary platforms for the production of oil. Petitioner James Broussard worked on land for Waukesha-Pearce Industries in the construction of housing modules and heliports for offshore stationary platforms.[1]

On occasion, as part of his job, each man helped load finished platforms or platform modules onto ocean-going barges. Each petitioner was injured on the job, and applied for benefits under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* (LHWCA). Neither was injured while engaged in loading operations. In each case the ALJ denied LHWCA benefits, holding that the injured worker neither had employee status nor received his injury on a covered situs as

---

1. Highlands Insurance Co. is the compensation insurance carrier for both employers.

defined by the Act. The Benefits Review Board upheld each decision, agreeing that neither Thornton nor Broussard was a covered employee, but declining to reach the question of whether either was injured on the navigable waters. We hold, however, that both Thornton and Broussard had employee status under § 902(3) of the LHWCA. Accordingly, in each case we reverse the decision below and remand for reconsideration of whether the petitioner was injured on a covered situs.

### Thornton's Tumble

Thornton was employed as a rigger at Brown & Root's Greens Bayou Fabrication Facility alongside the ship channel in Houston, Texas. This facility was used for the construction of stationary offshore drilling platforms. Thornton's usual job as a rigger was to hook construction materials up to a crane, which would then move them into position for assembly. At times, as part of his employment, he would help to "load-out" a completed platform from the facility onto barges, to be taken out to sea and fixed to the ocean floor.[2]

On the day of his injury, Thornton was not engaged in a load-out. On the contrary he was moving trash, wooden railroad ties and rebar[3] from D-yard of the facility, directly adjacent to the ship channel, to C-yard, approximately one quarter mile away, in order to clear room for platform construction in D-yard. He injured his leg when he fell from the back of a truck in C-yard.[4] No load-out was underway at the facility at the time.

The ALJ found that Thornton was not an "employee" under 33 U.S.C. § 902(3)—the so-called "status" test for coverage under the LHWCA—and that he was not injured upon the "navigable waters" as defined by 33 U.S.C. § 903(a)—the "situs" test.[5] The Benefits Review Board reached only the question of Thornton's employee status under § 902(3), and affirmed the ALJ's decision on that issue. *Thornton v. Brown & Root, Inc.*, BRB 79–126 (Nov. 28, 1980). Thornton was thus denied any relief under the LHWCA.

### Broussard's Bad Back

Broussard was one of approximately 10–11 fitters employed at Waukesha-Pearce's construction yard adjacent to navigable waters at the Port of Iberia, Louisiana. At this facility, Waukesha-Pearce built housing modules, some of which included heliports on top, for fixed offshore platforms. After completion, these platform modules were loaded onto barges and taken to their permanent locations.[6]

Broussard injured his back on land, while moving a wooden block out of the path of a tire of a mobile cherry picker, which was being used in the construction of a heliport. No load-out was in progress at the facility at the time.

---

2. Because of the size of the platforms and because the barges often had to be modified to receive them, each load-out took from one to seven days to complete. Seven to ten load-outs occurred every year. As found by the ALJ, a rigger spent an average of 21 workdays per year helping to load-out a platform. Using that 21 workdays average, one can calculate that a rigger who worked 260 days per year (five days a week for 52 weeks) would spend approximately 8% of his working time engaged in loading-out operations.

3. Rebar is steel reinforcing bar used in construction.

4. Both Thornton and Brown & Root agree that Thornton was temporarily and totally disabled from January 8, 1977, the date of the accident, to March 30, 1977. Thornton claims that he retains a 25% permanent disability, while

Brown & Root claims that Thornton's disability is only 15%.

5. She also held that Thornton had only a 15% permanent disability.

6. As in Brown & Root's case, the loading-out process often involved the modification of the barges. The ALJ found that 19 load-outs took place during the twenty and one-half months that Broussard was employed with Waukesha-Pearce, and that Broussard took part in three of these. He also found that an average of two fitters were required on every load-out. Broussard contends that in fact he participated in more load-outs than shown by the evidence produced by Waukesha-Pearce at the administrative hearing.

As in *Thornton,* the ALJ held that Broussard was not an "employee" under § 902(3), and that he was not injured "upon the navigable waters of the United States," as required by § 903(a). Also as in *Thornton,* the Benefits Review Board affirmed the ALJ's ruling that Thornton was not an "employee" under § 902(3), but did not reach the § 903(a) situs issue. *Broussard v. Waukesha-Pearce Industries, Inc.,* BRB 79–422 (Dec. 22, 1980).

### Oil upon the Waters—"Maritime Employment" Under § 902(3)

In *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977) the Supreme Court for the first time considered the effect of the 1972 amendments to the LHWCA. The Court concluded, among other things, that the amended Act required an injured claimant both to have been an "employee," as defined by § 902(3)[7] and to have been injured "upon the navigable waters of the United States," as defined by § 903(a).[8] *See also P.C. Pfeiffer v. Ford,* 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979). These two jurisdictional requirements are commonly referred to as the "status" (§ 902(3)) and the "situs" (§ 903(a)) tests. If either status or situs is missing, a claimant's injury ordinarily is not covered by the Act. The Benefits Review Board did not consider the situs question in either of these cases, but instead decided against the claimants on the basis of status. We conclude that both Thornton and Broussard meet the status test of § 902(3).

In deciding whether a worker is an employee under § 902(3), our underlying concern is whether he or she was "engaged in maritime employment." Maritime employment is not limited to the occupations specifically listed in § 902(3). *See Miller v. Central Dispatch, Inc.,* 673 F.2d 773 (5th Cir.1982); *Hullinghorst Industries, Inc. v. Carroll,* 650 F.2d 750 (5th Cir.1981); *Mississippi Coast Marine, Inc. v. Bosarge,* 637 F.2d 994 (5th Cir.1981); *Trotti & Thompson v. Crawford,* 631 F.2d 1214 (5th Cir.1980); *Odom Construction Co., Inc. v. United States Department of Labor,* 622 F.2d 110 (5th Cir.1980). Moreover, when considering the question of whether a worker is engaged in maritime employment, "we must look to the purpose of the work, not solely to the particular skills used." *Trotti & Thompson,* 631 F.2d at 1221, n. 16. As we pointed out in *Pippen v. Shell Oil Co.,* 661 F.2d 378 (5th Cir.1981), "The relevant inquiry in determining whether an employee was engaged in maritime employment is whether his activities had a 'realistically significant relationship to traditional maritime activity'". 661 F.2d at 382, *quoting Bosarge,* 637 F.2d at 998 and *Weyerhaeuser Co. v. Gilmore,* 528 F.2d 957, 961 (9th Cir. 1975), *cert. denied,* 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976).

7. § 902. Definitions
  When used in this chapter—
    *   *   *   *   *   *
  (3) The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a *master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.*

8. § 903. Coverage
  (a) Compensation shall be payable under this chapter in respect of disability or death of an employee, *but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry* dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). No compensation shall be payable in respect of the disability or death of—
  (1) A master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net; or
  (2) An officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof.
  (b) No compensation shall be payable if the injury was occasioned solely by the intoxication of the employee or by the willful intention of the employee to injure or kill himself or another.

Pippen was a wireline operator who was injured on a drilling barge while employed to perforate and set packers on the drilling rig. The defendants in the case claimed that Pippen was not engaged in maritime employment as required by § 902(3) and thus not entitled to compensation under the LHWCA. Citing *Bosarge, supra,* the Court employed the "significant relationship" test and determined that Pippen was indeed engaged in maritime employment. The *Pippen* court concluded,

The "significant relationship" requirement can be met when the purpose of the employee's activities is to facilitate maritime commerce. Since offshore drilling—the discovery, recovery and sale of oil and natural gas from the sea bottom—is maritime commerce, it follows that the purpose of Pippen's work was to facilitate maritime commerce.

661 F.2d at 383–84.

The Court went on to observe,

Indeed, the performance of a function that is essential to the effectuation of the offshore drilling process is work that certainly has a realistically significant connection to traditional maritime activity.

661 F.2d at 385.

In *Director, Office of Workers' Compensation Programs v. Perini North River Associates,* —— U.S. ——, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983) the Supreme Court held that it is neither necessary nor correct to apply the "substantial relationship" test to workers injured on the actual navigable waters. "[W]hen a worker is injured on the actual navigable waters in the course of his employment on those waters, he satisfies the status requirement in § 2(3) [§ 902(3)] ..." —— U.S. at ——, 103 S.Ct. at 651, 74 L.Ed.2d at 485. This Court had earlier reached the same conclusion in *Boudreaux v. American Workover, Inc.,* 680 F.2d 1034 (5th Cir.1982) (en banc). Therefore, the "significant relationship" test need no longer be used in a case like *Pippen,* in which the plaintiff was in fact injured upon the actual navigable waters.

Neither *Perini North River* nor *Boudreaux* decided the question of whether the substantial relationship test should be applied to determine the status of workers injured on land, within the LHWCA's expanded version of the navigable waters. *Boudreaux* stated that such a test may be appropriate, however. "To delineate only those shoreside employees who were legislatively intended to be included within the coverage of the Act, the *Weyerhaeuser* or an equivalent maritime-relationship test may indeed be appropriate." 680 F.2d at 1049.

Since *Boudreaux,* the Court has in fact adopted and applied that test. "The 'realistically significant relationship' test remains viable for workers injured upon land, be it natural or artificial." *Herb's Welding v. Gray,* 5th Cir., 1983, 703 F.2d 176.

For our purposes, in this case, *Boudreaux'*s greatest importance lies in its endorsement of *Pippen'*s holding that offshore drilling for and production of oil and gas is maritime commerce. *Boudreaux* quotes those sections of *Pippen* which so hold, and approves *Pippen'*s result and rationale. *Herb's Welding,* moreover, expressly follows *Pippen.*

■ It is firmly established in this Circuit, then, that "[o]ffshore drilling—the discovery, recovery, and sale of oil and natural gas from the sea bottom—is maritime commerce." *Pippen,* 661 F.2d at 384. A worker whose job directly facilitates that process is engaged in employment which has a substantial relationship to maritime commerce. This is true of production from fixed offshore platforms as well as of recovery and exploration from mobile drilling barges.

■ It is clear, therefore, that both Thornton and Broussard satisfy the status requirement of § 902(3). Thornton's job was helping to construct the platforms themselves, while Broussard's was helping to build the living quarters and heliports indispensable to the successful functioning of the fixed production platforms. We conclude, therefore, that both were engaged in

maritime employment and had employee status under § 902(3) of the LHWCA.[9]

Employee status alone does not suffice to afford Thornton and Broussard LHWCA coverage, however. As we have already pointed out, a successful LHWCA claimant must prove not only that he was an employee, but also that he was injured on a covered situs—the navigable waters as defined by the Act. In each of these cases, the ALJ concluded that the place of injury was not a covered situs. The Benefits Review Board did not consider the question.

We are convinced that in each of these cases there should be a factual reexamination of the record and an initial determination by the factfinder of the situs issue. In each, the ALJ's determination that the situs requirement was not met was founded upon two incorrect assumptions: that the construction taking place at the facility was not a "maritime enterprise" and that the platforms or modules, even when loaded onto barges, could not properly be considered "cargo in maritime commerce." In light of our decisions in *Boudreaux, Pippen* and *Herb's Welding,* those propositions are no longer tenable. Consequently, we remand each case to the Board for separate consideration of whether Thornton and Broussard satisfy the situs requirement of § 903(a). If so, the Board must decide the proper amount of benefits to be awarded each claimant.

### The Director's Role

■ These cases also present the procedural question of whether the Director of the Office of Workers' Compensation Programs is entitled to appear in these proceedings as a party respondent. The motion by Brown & Root and Highlands to strike the Director as a party respondent was carried with the case. The issue was recently settled in the Director's favor in *Ingalls Shipbuilding Division, Litton Systems, Inc. v. White,* 681 F.2d 275 (5th Cir. 1982). In *White,* the Court considered the applicability of F.R.A.P. 15(a) to this very question. Rule 15(a) sets forth a method for obtaining review of the order of an administrative agency in the courts of appeal. It states, in pertinent part, "The petition shall specify the parties seeking review and shall designate the respondent and the order or part thereof to be reviewed.... In each case the agency shall be named respondent." The Court, "reading Rule 15(a) together with the LHWCA and the regulations promulgated thereunder," concluded "that the Director is the agency respondent within the contemplation of Rule 15(a)...." 681 F.2d at 284.

Brown & Root, Highlands, and Waukesha-Pearce argue that *White* applies only when the Director is seeking affirmance of the Benefits Review Board's holding, not when the Director is seeking reversal of that holding, as here.

In *White,* however, the Court discussed *Shahady v. Atlas Tile & Marble Co.,* 673 F.2d 479 (D.C.Cir.1982), and considered the argument that Rule 15(a) applies only where the Director is appearing to defend the Commission's or Board's decision as a legal representative of the agency. This is the argument made by Brown & Root and Waukesha-Pearce. The *White* court expressly rejected that interpretation of Rule 15(a).

Brown & Root and Waukesha-Pearce argue that *Director, Office of Workers' Compensation Programs v. Donzi Marine, Inc.,* 586 F.2d 377 (5th Cir.1978) is controlling precedent in this case. *Donzi Marine,* however, dealt with the Director's standing as a petitioner under 33 U.S.C. § 921(c) (1976). It does not control the question of when the Director is a proper party respondent under F.R.A.P. 15(a). The Director is a proper party respondent before this Court.

---

**9.** In rejecting Thornton's and Broussard's claims to employee status, the Benefits Review Board looked at the amount of time each man spent in load-out operations, and concluded that neither had employee status because neither spent a "substantial portion" of his time in longshoring activities. The "substantial portion" test has been emphatically rejected by this Court. *Boudloche v. Howard Trucking Co., Inc.,* 632 F.2d 1346 (5th Cir.1980); *Howard v. Rebel Well Service,* 632 F.2d 1348 (5th Cir. 1980).

REVERSED AND REMANDED IN PART.